# UNITED STATES v. FRANKLIN COUNTY et al.

District Court, N. D. New York.

Jan. 28, 1943.

Ralph L. Emmons, U. S. Atty., of Binghamton, N. Y. (B. Fitch Tompkins, Asst. U. S. Atty., of Syracuse, N. Y., of counsel), C. C. Daniels, Sp. Asst. Atty. Gen., and Aubrey Lawrence, Sp. Asst. U. S. Atty. Gen., for the United States.

John J. Bennett, Jr., Atty. Gen. of State of New York, and Henry A. Cohen, Asst. Atty. Gen. of State of New York, for State of New York.

Ralph Levy, Co. Atty. of Malone, N. Y., for Board of Supervisors of Franklin County, Franklin County, and William H. Moore, County Treasurer.

George J. Moore, of Malone, N. Y., for Mabel Croke, Collector of Town of Bombay, Tp. No. 7, of Franklin County.

BRENNAN, District Judge.

This action is brought by the United States of America on its own behalf and as guardian and trustee of the St. Regis tribe or band of Indians, who occupy certain lands in Franklin County, New York, known as the St. Regis Indian Reservation, and has for its purpose the enjoining of the defendants and their successors from proceeding in any manner with the assessment, levy and collection of taxes upon certain lands described in the complaint, the cancellation of any tax liens now existing against such lands, and that same be declared to be free and exempt from all taxation.

The defendants are intended to include all officials of the County of Franklin, State of New York, or any subdivision thereof, having duties or powers concerning the levying or collection of taxes.

The People of the State of New York were granted permission by the Court to intervene as a defendant, and they take an active part in the trial of this action.

It is the claim of the plaintiff that the ten parcels of land referred to in the complaint are in fact a part of the tribal lands of the St. Regis Indians, and are, therefore, exempt from taxation.

The defendants admit most of the material allegations of the complaint, but deny the allegations that the assessment and levy of any taxes by the defendants are unlawful and without legal authority, and affirmatively allege that by reason of a treaty or conveyance dated December 14, 1824, the St. Regis Indians released and conveyed to the People of the State of New York all of their interest in and to certain parcels of land, including the premises described in the complaint.

Prior to the trial of this action a motion was made by the plaintiff for a summary judgment and appropriate relief under the provisions of Rule 56 of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c. In denying the motion for summary judgment and in accordance with the provisions of the rule, the Court specified certain facts as existing or established and limited the proof to be received at the trial.

The factual background of this action is contained in the following resume.

The St. Regis tribe of Indians were in occupation and possession of certain lands located in northern New York which include the lands which are the subject of this action, and as one of the Seven Nations of Canada entered into a treaty on May 31, 1796, 7 Stat. 55, with certain agents for the State of New York, whereby they ceded, released and quitclaimed to the People of the State of New York all of their lands within the State, "* * * Provided, nevertheless, That the tract equal to six miles square, reserved in the sale made by

the commissioners of the land-office of the said state, to Alexander Macomb, to be applied to the use of the Indians of the village of St. Regis, shall still remain so reserved * * *."

The lands in question are within the six-mile square area so reserved.

On March 15, 1802, the Chiefs of the St. Regis Indian tribe submitted to. the New York State Assembly certain papers which included a petition asking in substance that the State take one hundred acres of said land and construct a ferry across the Chateaugay River. The New York State Legislature on March 26, 1802, appointed three members of the tribe to act as trustees to consummate the requested transaction.

No action was taken until October 20 and 23, 1817, when the surviving trustee, appointed as above set forth, and three subscribing chiefs of the St. Regis tribe executed two leases with one Michael Hogan, lessee, covering tracts of land of 100 acres and 44 acres respectively, and it is conceded that the lands described in the bill of complaint are included within the leased property. These leases were ratified and confirmed by the enactment by the New York State Legislature of Chapter 185 of the Laws of 1819.

On March 8, 1824, the twelve chief warriors of the St. Regis tribe executed a power of attorney to four persons: " * * * to go to Albany and sell souch * a quantity of our lands to the people of this state as they may think proper and to transact all other business which shall be thought best for the welfare of our Nation * * *."

On December 14, 1824, in consideration of the enacting of legislation providing for the payment of an annuity of $305, the St. Regis Indians, through their attorneys appointed as above, quitclaimed to the State of New York their right, title and interest in and to the lands described in the leases theretofore made to Hogan.

The Legislature of the State of New York passed an Act on April 20, 1825, Laws 1825, c. 253, permitting Michael Hogan, or his assigns, to convey to the State of New York his interest in the lands described in the leases of 1817, and providing that when he shall have paid into the treasury of the State of New York a sum of money sufficient to produce annually the amount payable to the Indians, according to the terms of the leases, then letters-patent, covering such lands, should be issued to him by the proper officers of the State, and thereafter the State to pay to the St. Regis Indians the annuity due them in the same manner as other annuities were then payable.

On September 13, 1825, William Hogan, Sarah Hogan, his wife, and John Glendenning, Jr., to whom Michael Hogan had assigned the leases on March 9, 1821, granted to the State their interest in the premises covered by the Hogan leases.

On September 14, 1825, upon the deposit of an agreed consideration with the State of New York, the State issued letters-patent to William Hogan and John Glendenning, Jr., covering the 144 acre tract described in the Hogan leases of 1817.

It appears that the Village of Hogansburg has been built within the 144 acre tract; that that tract has been subdivided and sold to different owners, among which subdivisions are the ten parcels of land referred to in the complaint, which for a long period of time have been subject to taxation and taxes so levied have been paid.

The Village has a white population of about two hundred fifty persons; there are two churches, one Indian public school, five stores, one hotel, and the United States government has leased structures therein for use as a post office and a custom house or immigration building.

The annuity payable under the provisions of the grant of December 14, 1824, has been paid.

The record title of the ten parcels of land referred to in the complaint is held by the ten members of the St. Regis tribe by reason of conveyances based upon the patent issued to Hogan and Glendenning. They do not hold the lands either by allotment or under any authority of the St. Regis tribe.

It is the plaintiff's contention that the two leases of 1817 made to Hogan, and the subsequent transfer to the State of New York in 1824, are invalid by reason of the provisions of the Indian Intercourse Act of March 30, 1802, 2 Stat. 139, which provides that no purchase, grant, lease or other conveyance of land or any title or claim thereto from any Indian, or nation or tribe of Indians, within the bounds of the United States of America shall be of any validity in law or in equity unless the same be made

---

* So in the original.

by treaty or convention entered into pursuant to the Constitution.

It is provided, however, that it shall be lawful for the agent of the State who may be present at any treaty held with Indians under the authority of the United States in the presence and with the approval of the Commissioner of the United States appointed to hold same, to adjust with the Indians the compensation to be made for their claims to lands within such state, which shall be extinguished by the treaty.

Neither the leases of 1817, nor the deed of the Indians to the State in 1824, show on their face the approval or the presence of a Commissioner appointed by the United States.

The defendants claim, (a) that the leases of 1817 and the conveyance of 1824 are valid, and (b) that the plaintiff is estopped from testing the validity of the conveyances by reason of acquiescence and laches.

In support of their respective contentions the parties offered documentary evidence; the plaintiff showing, through a number of documents and writings, that the authors understood or believed that the sale of so-called Indian lands by the Indians must be made under the supervision of the United States in accordance with the provisions of the Indian Intercourse Act of 1802, above referred to. The defendants offer in evidence about fifty exhibits consisting of written instruments generally described as "treaties", which purported to convey or release the rights or interests of Indian tribes in lands within the State of New York. In fact, the State acquired the title of large tracts of land through such documents. The exhibits cover a period between June, 1785, and February, 1846, and it appears that but six of these exhibits show in their recitals that a United States commissioner was present at the time of the negotiation or execution of such treaties.

■ The plaintiff claims that the defendant has the burden of proof to establish that the conveyance by the Indians to the State of New York on December 14, 1824, was valid in fact and in conformity with existing law. The defendants assert that the burden of showing invalidity is upon the plaintiff. The technical rules and niceties of pleading cannot be invoked to upset the well settled rule that the existence of letters-patent creates a presumption that all preceding steps required by law were duly observed, and that convincing evidence to the contrary must be produced before a finding annulling the patent is warranted. Diamond Coal Co. v. United States, 233 U.S. 236, 34 S.Ct. 507, 58 L.Ed. 936.

If the conveyance to the State by the St. Regis Indians was valid, and sufficient to convey all of their right in said lands to the State of New York, then it is unnecessary to decide the other contentions raised by the parties in this case. In the interest of the stability of real estate titles this question should be definitely decided, as plaintiff's claims challenge the title of thousands of acres of land within the State of New York.

■ The right of the Indians in so-called "tribal lands" was one of occupancy only; the fee of the lands remained in the sovereign which in the instant case was the State of New York. Johnson v. McIntosh, 8 Wheat. 543, 5 L.Ed. 681.

The language of the treaty of 1796 leaves no doubt that the St. Regis Indians knew and understood the nature of their rights in the lands in question.

We then come to the question as to whether or not the provisions of the Indian Intercourse Act of 1802 apply to the transaction of December 14, 1824, to which the State of New York was a party.

The voluminous briefs filed by the parties and research connected therewith does not reveal that this question has been definitely passed upon by the Courts.

The property rights of Indians and the limitation imposed thereon have been the subject of many decisions, not all of which have tended to clarify the general subject. This is due in part to a failure to differentiate between the rights, obligations and limitations applicable when the right of pre-emption is in the United States and when it rests in the individual state.

The effect of the decision prompts the elimination of discussion of legal precedent, except such as may be concisely pertinent.

The history of the Act of 1802 and preceding legislation is indicative of an intent to exempt a state "having the right of pre-emption" from the provisions thereof. The first Indian Intercourse Act of 1790 invalidated by its language the sale of lands within the United States to any person or persons, "or to any state, whether having the right of pre-emption or not." The

clause quoted was omitted from the Act of 1802 and from the preceding Acts of 1796 and 1799. The omission is significant when viewed in the light of the practical construction given to the Act by both the State of New York and the United States.

The large number of treaties or agreements entered into by the State of New York with different Indian tribes without the apparent authority of the United States, or the presence of its Commissioner requires that we look beyond the language of the Statute to ascertain its applicability. "The words, although general, must be read in the light of the act as a whole, and with due regard to the situation in which they were to be applied." United States v. Nice, 241 U.S. 591, at page 600, 36 S.Ct. 696, 698, 60 L.Ed. 1192.

In the case of Seneca Nation of Indians v. Christie, 126 N.Y. 122, 27 N.E. 275, it was definitely held that the State of New York had the power and right to make treaties with the Indian tribes within the State for the purchase of their lands to which it held the pre-emptive right. The plaintiff does not seriously dispute such holding, but does assert that the absence of a United States Commissioner (if such absence be conceded) at the time of negotiation and execution of the instrument of 1824 results in its total invalidity.

Such a conclusion would be contrary to the practical construction placed on the Act by both the State of New York and the United States, as described above.

Reference is again made to the case of Seneca Nation of Indians v. Christie, 126 N.Y. 122, 27 N.E. 275, in which we find the following significant quotation: " * * * The State of New York and the other states were at the same time owners of lands in the occupation of the Indian tribes within their respective limits, also having the exclusive power to extinguish the Indian title thereto. The United States could not impair the title of the states, nor purchase the lands, nor authorize any purchase, without the consent of the state within which they were situated. * * * " Seneca Nation of Indians v. Christie, 126 N.Y. 122, at page 143, 27 N.E. 275, 281.

" * * * The existence of this power must negative the existence of any right which may conflict with and control it. * * * " Johnson v. McIntosh, 8 Wheat. 543, at page 588, 5 L.Ed. 681.

The fact that a United States Commissioner was present at the transaction refered to in the Seneca Nation of Indians v. Christie case avoided the necessity of a direct ruling on the question under discussion, but the doubt expressed by the Court as to the applicability of the provisions of the Act is significant.

To require the presence and approbation of a United States Commissioner at a treaty or transaction where the State has the exclusive right to deal with the matter concerned would appear to result in a conflict of legal rights. The evidence shows that the existence of such requirement was not recognized either by the State of New York or by the United States.

The Act, by its terms, does not require the presence of a United States Commissioner at a treaty as a prerequisite to its validity, but gives an agent of a state the lawful right to negotiate with the Indians under given conditions. It is at most regulatory, designed to prevent fraud. Here no fraud is charged.

The conclusion is reached that the conveyance of 1824 by the St. Regis Indians to the State of New York is valid and that the provision of the Act of 1802 does not apply thereto.

The judgment dismissing the complaint might be placed upon the lack of evidence to show the invalidity of the leases of 1817 and the conveyance of 1824, but in arriving at the conclusion the following quotation taken from Seneca Nation of Indians v. Christie, 126 N.Y. 122, at page 147, 27 N.E. 275, at page 282, seems to be especially pertinent: " * * * In view of the numerous Indian titles in this state originating in treaties by the state, or in purchases made with its sanction by individuals, we prefer to place our judgment on the broader ground, which will remove any cloud upon the validity of those titles. * * * "

The complaint is dismissed.