MOHEGAN TRIBE

v.

STATE of CONNECTICUT.

Civ. No. H–77–434 Civil.

United States District Court,
D. Connecticut.

Jan. 11, 1982.

---

Jerome M. Griner, West Hartford, Conn., John R. Williams, New Haven, Conn., for plaintiff.

Francis J. MacGregor, and Gerard J. Dowling, Asst. Attys. Gen., Hartford, Conn., for defendant.

## RULING ON PLAINTIFF'S MOTION TO STRIKE AFFIRMATIVE DEFENSES

BLUMENFELD, Senior District Judge.

This litigation involves a claim by the Mohegan Tribe for possession of certain land located in the northeast portion of the town of Montville, Connecticut. The Tribe alleges that the land is part of its aboriginal territory and was alienated in violation of Article I, Section 8 of the United States Constitution, the Indian Trade and Intercourse Act, 25 U.S.C. § 177, and various other provisions of the federal Constitution and the Connecticut Constitution and laws. In addition to possession, the Tribe seeks a declaration of rights and title with respect to the land in question and an award of rents and profits as well as attorneys' fees and costs.

In previous rulings in this case, this court has, among other things, struck the defense of laches as insufficient as a matter of law and denied a motion to dismiss based on the argument that the Nonintercourse Act applies only in western "Indian country" and not in the eastern states, *Mohegan Tribe v. State of Connecticut*, 483 F.Supp. 597 (D.Conn.), aff'd, 638 F.2d 612 (2d Cir. 1980), cert. denied, —— U.S. ——, 101 S.Ct. 3124, 69 L.Ed.2d 981 (1981).

Presently before this court is Plaintiff's Motion to Strike the Defendant's Four Additional Defenses. On May 26, 1981 the State of Connecticut was granted permission to amend its answer to plead four additional affirmative defenses. First, the State pleads that the Indian Trade and Intercourse Acts did not bar land transac-

tions involving one of the original thirteen states except for the period from 1790 to 1793. Second, Connecticut pleads that "the Eleventh Amendment is a bar to retroactive claims for money damages and interest." Third, the State contends that the plaintiff's action is barred by the tenth amendment to the United States Constitution. The fourth additional defense raises the question of whether a judgment rendered on August 15, 1743 is res judicata and thus bars this action.

 The plaintiff now moves pursuant to Rule 12(f) of the Federal Rules of Civil Procedure to strike all four additional defenses as legally insufficient. The standard for determining legal sufficiency under Rule 12(f) is narrow. The presence of a substantial or seriously disputed question of law will preclude a district court from granting a motion to strike. *United States v. 187.40 Acres of Land*, 381 F.Supp. 54, 56 (M.D.Pa.1974). Close or new questions of law should not be resolved on a motion to strike which is ordinarily not appealable and which, if appealed pursuant to 28 U.S.C. § 1292(b), would create piecemeal litigation. "A motion to strike can be granted only if the legal insufficiency of the defense is 'clearly apparent.'" *May Dept. Stores Co. v. First Hartford Corp.*, 435 F.Supp. 849, 855 (D.Conn.1977). *Accord, Occidental Life Insurance Co. v. Fried*, 245 F.Supp. 211, 213 (D.Conn.1965).

 Although a motion to strike a defense on grounds of legal insufficiency is not favored, such motions do serve as "the primary procedure for objecting to an insufficient defense." *Narragansett Tribe of Indians v. Southern Rhode Island Land Devel. Corp.*, 418 F.Supp. 798, 801 (D.R.I. 1976) (quoting from Wright and Miller, *Federal Practice and Procedure*, § 1381 at 782 (1969)). Where the merits of a defense have been fully briefed and argued it is within the discretion of the district court to determine its legal sufficiency at a pre-trial stage particularly where the postponement of the question until trial would considerably complicate discovery. *Id.* at 801–02. *See also Schaghticoke Tribe of Indians v.*

*Kent School Corp.*, 423 F.Supp. 780, 783 (D.Conn.1976) (leave to amend answer to add defenses denied for legal insufficiency). The legal issues presented by all four of these defenses would greatly complicate the pre-trial process. This case is already extraordinarily complex, and it is the conclusion of this court that if the legal insufficiency of these defenses is "clearly apparent" it would be appropriate to dispose of them at this stage of the litigation. Hopefully, this early resolution of defenses that "could not possibly prevent recovery" by the plaintiff, *Narragansett Tribe v. So. R.I. Land Devel. Corp.*, 418 F.Supp. at 802, will facilitate the orderly progress of this protracted litigation towards either trial or settlement.

 Disputed questions of fact cannot be decided on a motion to strike and, therefore, for purposes of this motion the defendant's well pleaded factual allegations will be assumed to be true. However, mere conclusory allegations are not controlling and will not be deemed to be admitted for purposes of this motion. *Kohen v. H. S. Crocker Co.*, 260 F.2d 790, 792 (5th Cir. 1958). Also, "to the extent that the challenged defenses are not factually in conflict with those facts alleged by plaintiff to support its claim for recovery, we must, for purposes of this motion, assume that plaintiff will be able to establish them at trial." *Narragansett Tribe v. So. R.I. Land Devel. Corp.*, 418 F.Supp. at 802.

### I. *The Nonintercourse Act*

The State of Connecticut pleads as its first additional affirmative defense that "[e]xcept for the dates between July 22, 1790 and March 1, 1793, the Alienation of Land Sections of the Indian Trade and Intercourse Acts did not bar land transactions involving the defendant." The Indian Trade and Intercourse Act, originally enacted in 1790 and in effect in substantially the same form today, provides a comprehensive regulatory scheme governing trade and intercourse with Indian nations and individuals within the United States. Section 4 of the Act of 1790 contained the first Nonintercourse statute which declared

[t]hat no sale of lands made by any Indians, or any nation or tribe of Indians within the United States, shall be valid to any person, or persons, or to any state, whether having the right of pre-emption to such lands or not, unless the same shall be made and duly executed at some public treaty, held under the authority of the United States.

Act of July 22, 1790, ch. 33, § 4, 1 Stat. 137. In 1793 the Trade and Intercourse Act was reenacted in an expanded version. Section 4 of the 1790 Act became Section 8 of the 1793 Act reading:

no purchase or grant of lands, or any title or claim thereto, from any Indians or nation or tribe of Indians, within the bounds of the United States, shall be of any validity in law or equity, unless the same be made by a treaty or convention entered into pursuant to the constitution . . . .

Act of March 1, 1793, ch. 19, § 8, 1 Stat. 329.

The defendant contends that by deleting the phrase "to any state, whether having the right of pre-emption to such lands or not," Congress intended to exempt sales of lands to the states from the general prohibition against sales of Indian lands without the consent of the United States government. In support of this construction the State argues (1) that the Indian Trade and Intercourse Acts passed in the late 18th and early 19th centuries were directed towards the problems of the Indians living in the frontier or to the west in Indian country, not to those living within the territory of the original states; (2) that the Supreme Court in *Wilson v. Omaha Tribe*, 442 U.S. 653, 667–68, 99 S.Ct. 2529, 2537–38, 61 L.Ed.2d 153 (1979), recognized that the states stand in a different footing than individuals in their dealings with Indians; and (3) that Congress expressed its understanding that the Nonintercourse Act did not proscribe land transactions with the states when it passed the Act of September 13, 1950, 25 U.S.C. § 233, which specifically prohibits the alienation of reservation land in New York. The defendant contends that

if such sales were already prohibited under the Nonintercourse Act, this provision of the Act of 1950 would be superfluous.

The plaintiff Tribe, in support of its motion to strike this defense, argues that the language of the Nonintercourse Act clearly demonstrates the falsity of the defendant's construction of the 1793 amendment, that the defendant is attempting to relitigate an issue that was decided against it by this court and the Second Circuit, *Mohegan Tribe v. State of Connecticut*, 638 F.2d 612, aff'g, 483 F.Supp. 597, and that regardless of the merits of this statutory argument, the defense is inapplicable to the facts of this case because the plaintiff alleges and the defendant concedes that Connecticut was not the immediate grantee but obtained its title to the land in question through various "mesne conveyances" involving private parties. According to the plaintiff, the original grants to private individuals violated the Nonintercourse Act even under the defendant's suggested construction of the Act and are void. Any title obtained by Connecticut through these grantees would also be void regardless of whether a grant of land directly from the Tribe to the State is proscribed by the Nonintercourse Act.

Since I agree that the defendant's statutory argument does not present a substantial question of law and, at any rate, would not defeat the plaintiff's claims in this case, I grant the motion to strike this first additional defense.

■ . The language of the Nonintercourse Act declares without qualification that "[n]o purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity" unless consented to by the United States government. 25 U.S.C. § 177. The statute thus clearly voids any grant made by an Indian tribe without the consent of the federal government. If the original grant was void, any title deriving from it would also be void. The State not only concedes that it obtained title to the land at issue in this case through grants from private persons, but has provided the Tribe with a list of

those persons from whom the State purchased the land. Thus, even if I were to accept for the sake of argument the defendant's contention that grants to the original states are not covered by the prohibition of the Nonintercourse Act, the Act still applies to the land at issue here because Connecticut obtained its title through private parties. The Act voids the grants to the State's predecessors in interest regardless of whether it voids grants directly from a tribe to a state and, therefore, the State's title is also of no validity because it derives from grants to private parties.

■ At any rate, the defendant's argument that the Nonintercourse Act does not apply to transactions with the states can be easily disposed of by an examination of the statutory language. The State relies upon the fact that after 1793 the Nonintercourse Act did not include the words "to any state whether having the right of pre-emption to such lands or not." The State contends that the deletion of this language demonstrates Congress' intention to exclude grants to the states from the coverage of the Nonintercourse Act. However, the 1793 amendment also deleted the words "to any person or persons." If I accept the State's argument that the deletion of the words "to any state" indicates an intention to exempt grants to the states it necessarily follows that Congress also intended to exempt grants "to any person or persons" from the Act's coverage. Such a construction is clearly absurd since it leaves the Nonintercourse Act with no effect whatsoever.

The defendant's proposed construction is contradicted by a plain reading of the statute. As amended in 1793 the Act stated "[t]hat no purchase or grant of lands . . . from any Indians . . . shall be of any validity . . ." without federal consent. Act of March 1, 1793 (emphasis added). The clear import of this language is to prohibit all sales of Indian land without federal consent. United States v. Oneida Nation of New York, 477 F.2d 939, 943–44 (Ct.Cl. 1973). When compared with the previous version of the statute which specified those

grantees as to whom the prohibition applied, this second version is a stronger prohibition, not a weaker one, because Congress omitted the earlier limitation on the class of prohibited grantees.

None of the arguments presented by the defendant give this court any reason to ignore the clear meaning of the statute's language. I have previously disposed of the defendant's contention that the Nonintercourse Act was directed solely towards the situation on the frontier and was not meant to apply in the original eastern states. *Mohegan Tribe v. State of Connecticut*, 483 F.Supp. 597. The defendant's reliance on *Wilson v. Omaha Tribe*, 442 U.S. 653, 99 S.Ct. 2529, 61 L.Ed.2d 153 (1979), is misplaced. In that case the Supreme Court held that Congress did not intend, by passing a statute providing "[i]n all trials about the right of property in which an Indian may be a party on one side, and a white person on the other, the burden of proof shall rest upon the white person," 25 U.S.C. § 194, to include the states within the term "white person." *Wilson v. Omaha Tribe*, 442 U.S. at 667, 99 S.Ct. at 2537. The Court's holding was specifically premised on the statute's use of the term "person," *id.*, and does not support the defendant's argument that in construing federal Indian legislation the courts must generally treat the states differently than private persons.

■ The defendant also contends that by enacting 25 U.S.C. § 233 Congress expressed its understanding that there was no existing prohibition against sales of Indian lands directly to the original states. The fallacy of this argument can be seen by simply reading the statutory language. The Act of September 13, 1950, 25 U.S.C. § 233, gave the State of New York jurisdiction over legal proceedings involving Indians within New York. Congress, although consenting to the state's exercise of this power over the Indians residing within its borders, explicitly provided that "nothing herein contained shall be construed as authorizing the alienation from any Indian nation, tribe, or band of Indians of any lands within any Indian reservation in the

State of New York." *Id.* This proviso was added to ensure that the courts would not construe 25 U.S.C. § 233 as repealing the Nonintercourse Act in New York. It was meant to reaffirm the Nonintercourse Act's application to transactions within New York. At any rate, 25 U.S.C. § 233 is not relevant to the issue raised by the defendant's first additional defense because by its terms this proviso upon which the defendant relies addresses only the question of whether the prohibition against alienation of Indian lands applies *within* New York, not whether it applies to transactions *with* the State of New York. This argument, therefore, is of no help to this court's resolution of the issue before it.

The only case law which the State can cite in favor of its construction of the 1793 amendment to the Nonintercourse Act is a 38-year-old opinion of the Northern District of New York, *United States v. Franklin County*, 50 F.Supp. 152 (W.D.N.Y.1943). This case held that because the State of New York held the right of preemption as to Indian lands as one of the original thirteen states, the Nonintercourse Act did not apply to Indian land transactions to which the State was a party. *Id.* at 156. This decision, however, does not reflect the existing law on the subject. The Second Circuit has rejected the argument that the Nonintercourse Acts apply in any different fashion to transactions involving one of the original states. *Tuscarora Nation of Indians v. Power Authority of New York*, 257 F.2d 885, 890 (2d Cir. 1958), *vacated as moot*, 362 U.S. 608, 80 S.Ct. 960, 4 L.Ed.2d 1009 (1960) (cited with approval in *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 674 n.9, 94 S.Ct. 772, 781 n.9, 39 L.Ed.2d 73 (1974)). The Second Circuit held that New York could exercise the power of eminent domain as to Indian reservation land but only as a licensed federal agent and only because the federal Congress had authorized the taking of Indian land. *Id.* at 893. The Nonintercourse Act requires that any exercise of the power of eminent domain as to Indian land "must be by the United States through Congress." *Id.* The courts of New York also recognize that

Congress has the same power over the Indians residing in the original eastern states as it does over those residing in the west. *Id.* at 890, *citing with approval People ex rel. Cuisck v. Daly*, 212 N.Y. 183, 193, 105 N.E. 1048 (N.Y.Ct. of Appeals 1914).

■ It is apparent, therefore, that the defendant's proposed construction of the 1793 amendment to the Nonintercourse Act is not supported by either a fair reading of the statute or the case law. It is generally recognized that the federal government has ultimate responsibility for the Indian nations throughout the United States, including those residing within the original thirteen states. *E.g., Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974); *Mohegan Tribe v. State of Connecticut*, 638 F.2d 612 (2d Cir. 1980). In exercising this responsibility, the federal government, since the earliest days of our nation, has restrained the power of the Indian peoples to alienate their tribal land in order to protect them from being overrun by the European settlers. The Nonintercourse Act is the backbone of this federal policy and applies throughout the nation. *Mohegan Tribe v. State of Connecticut*, 483 F.Supp. 597; *Schaghticoke Tribe of Indians v. Kent School Corp.*, 423 F.Supp. at 784 n.5. As the Supreme Court has recently affirmed:

Indian title is a matter of federal law and can be extinguished only with federal consent . . . in all of the states, including the original 13. It is true that the United States never held fee title to the Indian lands in the original States as it did to almost all the rest of the continental United States and that fee title to Indian lands in these States, or the pre-emptive right to purchase from the Indians, was in the State . . . . But this reality did not alter the doctrine that federal law, treaties, and statutes protected Indian occupancy and that its termination was exclusively the province of federal law.

*Oneida Indian Nation v. County of Oneida*, 414 U.S. at 670, 94 S.Ct. at 778.

I conclude that the defendant's first additional affirmative defense raises no substantial question of law and, therefore, the plaintiff's motion to strike this first additional defense is granted.

## II. *The Eleventh Amendment*

■■■■ The defendant pleads as its second additional defense that "[t]he Eleventh Amendment is a bar to retroactive claims for money damages and interest." The eleventh amendment provides:

> The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by Citizens or Subjects of any Foreign State.

This amendment has been consistently construed to apply to suits against a state by its own citizens as well as citizens of another state. *E.g., Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890); *Edelman v. Jordan*, 415 U.S. 651, 663, 94 S.Ct. 1347, 1352, 39 L.Ed.2d 662 (1974). The amendment embodies and expands the common law doctrine of sovereign immunity. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976); *Monaco v. Mississippi*, 292 U.S. 313, 329, 54 S.Ct. 745, 750, 78 L.Ed. 1282 (1934); *Narragansett Tribe of Indians v. Murphy*, 426 F.Supp. 132, 134 (D.R.I.1976). Thus, if a state consents to suit it may waive its eleventh amendment immunity just as it could waive its common law sovereign immunity despite the amendment's language which appears to establish a jurisdictional bar. *Ford Motor Co. v. Dept. of Treasury*, 323 U.S. 459, 464–65, 65 S.Ct. 347, 350–51, 89 L.Ed. 389 (1945); *Langton v. Maloney*, 527 F.Supp. 538 (D.Conn.1981).

The plaintiff raises various grounds to support its contention that the state's eleventh amendment defense is legally insufficient. It argues (1) that the defense is inapplicable to this action which is essentially equitable in nature; (2) that Congress abrogated the eleventh amendment by enacting the Nonintercourse Act; and (3) that the State has waived any possible eleventh amendment defense by asserting a counterclaim seeking affirmative relief in this case.

Since I conclude that the defendant has waived any eleventh amendment immunity it may have by its assertion of a counterclaim in this litigation, it is unnecessary to resolve the other issues raised by plaintiff's motion to strike. By its answer filed with this court on October 12, 1977, the defendant asserted a counterclaim seeking compensation for the fair market value of improvements made by the State while in possession of the land claimed by the Tribe in the event the court awards possession of the land to the plaintiff. In addition, the defendant prayed that the court "grant the defendant such other relief against the plaintiff as it deems just." [1]

■■■■ To find that the State has waived its immunity by its assertion of a counterclaim, this court must be convinced, not only that the State's claim was sufficiently affirmative to constitute consent to suit in federal court, but also that the state attorney general has the authority under state law to consent to suit on behalf of the state, *Ford Motor Co. v. Dept. of Treasury*, 323 U.S. at 467, 65 S.Ct. at 352. As to this later question, it has been assumed, and the defendant does not contend otherwise, that the attorney general of Connecticut has the authority to waive the State's eleventh amendment immunity by participating in federal litigation. *See In re Crisp*, 521 F.2d 172, 178 (2d Cir. 1975) (alternative holding); *Jordan v. Fusari*, 496 F.2d 646, 651 (2d Cir. 1974) (alternative holding). The decisive question, therefore, is whether the assertion of this counterclaim constituted sufficiently affirmative participation in this litigation to amount to a waiver of the State's eleventh amendment immunity.

■■■■ It is now well established that merely appearing and defending on the merits does not constitute waiver of a

---

1. This counterclaim was subsequently dismissed on the plaintiff's motion by an order of the court dated August 16, 1978.

state's eleven amendment immunity. The Supreme Court has held that because the eleventh amendment is "of the nature of a jurisdictional bar" it can be raised for the first time on appeal. *Edelman v. Jordan*, 415 U.S. at 677–78, 94 S.Ct. at 1362–69. However, in some circumstances, a state's participation in federal litigation does rise to the level of a waiver. *E.g., Clark v. Barnard*, 108 U.S. 436, 447–48, 2 S.Ct. 878, 882–83, 27 L.Ed. 780 (1883); *Vecchione v. Wohlgemuth*, 558 F.2d 150 (3d Cir.), *cert. denied sub nom. Beal v. Vecchione*, 434 U.S. 943, 98 S.Ct. 439, 54 L.Ed.2d 304 (1977); *Jordan v. Fusari*, 496 F.2d at 651.

In *Clark v. Barnard* the Supreme Court held that Rhode Island waived its eleventh amendment immunity by voluntarily intervening as a claimant of a fund paid into the court. *Clark v. Barnard*, 108 U.S. at 448, 2 S.Ct. at 883. The fact that the state sought affirmative relief was dispositive of the waiver question:

> [T]he State of Rhode Island appeared in the cause and presented and prosecuted a claim to the fund in controversy, and thereby made itself a party to the litigation to the full extent required for its complete determination. It became an actor as well as defendant . . . .

*Id.* Where, however, the state's intervention was limited to a request that the subject matter of the suit not be distributed pending the outcome of a state court adjudication of the state's tax interest, the Supreme Court has held that the "intervention was too limited in character to constitute a waiver" of the state's eleventh amendment immunity. *Missouri v. Fiske*, 290 U.S. 18, 25, 54 S.Ct. 18, 20, 78 L.Ed. 145 (1933).

▮ The lower courts have reached a variety of results on the question depending on the particular circumstances of the case. For example, the Second Circuit has held that agreeing to a stipulated settlement constitutes waiver of the state's immunity as to subsequent proceedings related to the same litigation, *New York State Assoc. for Retarded Children, Inc. v. Carey*, 596 F.2d 27, 39 (2d Cir.), *cert. denied sub nom. Coughlin v. New York State Assoc. for Re-*

*tarded Children*, 444 U.S. 836, 100 S.Ct. 70, 62 L.Ed.2d 46 (1979); *Jordan v. Fusari*, 496 F.2d at 651, although the Third Circuit has suggested that such a waiver cannot be final until the time for an appeal has run because of the Supreme Court's holding in *Edelman v. Jordan* that an eleventh amendment defense can be raised for the first time on appeal, *Vecchione v. Wohlgemuth*, 558 F.2d at 159. Filing suit as a plaintiff generally constitutes a waiver of a state's immunity as to counterclaims asserted against the state at least where the counterclaim seeks recoupment and not any affirmative relief unrelated to the state's claim. *Maryland Port Administration v. S.S. American Legend*, 453 F.Supp. 584, 590 (D.Md.1978); *Treasure Salvors, Inc. v. Unidentified Wrecked*, 459 F.Supp. 507 (S.D. Fla.1978), *aff'd sub nom. Re State of Florida v. Treasure Salvors*, 621 F.2d 1340 (5th Cir. 1980). Assertion by the state of a counterclaim has also been held to be such a waiver in some circumstances, *Aldens v. Ryan*, 454 F.Supp. 465, 470 (W.D.Okla.1976) (alternative holding), as has filing a proof of claim in a bankruptcy proceeding, *In re Crisp*, 521 F.2d at 178 (alternative holding).

▮ In this case, the defendant characterizes its counterclaim as only a defensive claim for recoupment. The State, however, sought the full value of any improvements made on the land. Its counterclaim was not limited to the amount of any damages that may be awarded to the Tribe. In addition, the State sought any additional relief that the court might award. The defendant, therefore, has sought affirmative relief sufficient to constitute a waiver of any immunity it may have had by virtue of the eleventh amendment to the United States Constitution. *See Clark v. Barnard*, 108 U.S. at 448, 2 S.Ct. at 883; *Aldens, Inc. v. Ryan*, 454 F.Supp. at 470.

I therefore, grant the plaintiff's motion to strike the defendant's second additional defense.

### III. *The Tenth Amendment*

▮ The State's third additional defense is that the tenth amendment of the United States Constitution bars plaintiff's claim

for land owned by the State. Specifically, the State pleads:

Because the land occupied by the plaintiff at the pleasure of the defendant was vested in the defendant in full and absolute property in right of law, and because the plaintiff had no aboriginal possession in said land but only a right of occupancy granted it by the defendant, and because the plaintiff, an original state, never ceded any rights in the land involved in this lawsuit to the Federal Government, the plaintiff's action is barred by the Tenth Amendment.

It is not exactly clear to this court why the State contends that the tenth amendment and the doctrine of intergovernmental immunities enunciated in *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), is relevant to this case. Apparently the State argues that it is beyond the power of Congress to apply the Nonintercourse Act to land owned by one of the original states at least where the Indian tribe has no aboriginal possessory rights. A brief review of the *National League of Cities* doctrine, as explained by the Supreme Court in its recent opinion in *Hodel v. Virginia Surface Mining and Reclamation Assoc.*, —— U.S. ——, 101 S.Ct. 2352, 2366, 69 L.Ed.2d 1 (1981), demonstrates, however, that the tenth amendment provides no defense to this litigation.

In *National League of Cities* the Court held that Congress does not have the power to apply the minimum wage and maximum hour provisions of the Fair Labor Standards Act to state and local employees. *National League of Cities v. Usery*. The Court held that, although the commerce clause grants plenary authority to regulate wholly private activity affecting commerce, the tenth amendment and the principles of federalism it embodies limit this power when Congress attempts to regulate "the States as States." *Id.* at 845, 96 S.Ct. at 2471. At least when exercising its power under the commerce clause Congress cannot interfere with "the States' freedom to structure integral operations in areas of traditional governmental functions." *Id.* at 852, 96 S.Ct. at 2474.

This past term the Court elaborated on this doctrine in an opinion rejecting a constitutional challenge to the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. §§ 1201 *et seq. Hodel v. Virginia Surface Mining and Reclamation Assoc.*, —— U.S. ——, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981). The Court explained that

in order to succeed, a claim that congressional commerce power legislation is invalid under the reasoning of *National League of Cities* must satisfy *each* of three requirements. First, there must be a showing that the challenged statute regulates the "States as States." Second, the federal regulation must address matters that are indisputably "attributes of state sovereignty." And third, it must be apparent that the States' compliance with federal law would directly impair their ability "to structure integral operations in areas of traditional functions."

*Id.* 101 S.Ct. at 2366 (citations omitted) (emphasis in original). The Court continued in a footnote:

Demonstrating that these three requirements are met does not, however, guarantee that a Tenth Amendment challenge to congressional commerce power action will succeed. There are situations in which the nature of the federal interest advanced may be such that it justifies State submission.

*Id.* at 2366 n.29 (citations omitted).

The defendant's tenth amendment challenge to this application of the Nonintercourse Act to land owned by one of the original states does not meet any of the elements set out in the *Hodel* opinion. The Act does not regulate the State of Connecticut as a state nor address "matters that are indisputably 'attributes of state sovereignty.'" *Id.* at 2366. It merely requires that all grants of land by Indians be made solely with the consent of the federal government. It applies to Connecticut only in its capacity as a landowner, not as a sovereign government. At any rate, it is clear that the State's compliance with the Nonintercourse Act does not in any way impair its ability "to structure integral operations in areas of

traditional functions," *National League of Cities,* 426 U.S. at 852, 96 S.Ct. at 2474. In addition, centuries of case law and federal legislation have recognized the strength of the federal government's interest in regulating Indian land transactions. *See, e.g., cases cited in Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 669 n.5, 94 S.Ct. 772, 778 n.5, 39 L.Ed.2d 73 (1974).

It is apparent from the above discussion that the tenth amendment doctrine for which *National League of Cities* stands cannot under any view of the facts defeat the plaintiff's claims in this case. It is appropriate for this court, therefore, to dispose of this defense at this stage by granting the plaintiff's motion to strike the defendant's tenth amendment defense.

### IV. *The 1743 Judgment*

As its fourth additional defense the defendant pleads a 1743 judgment affirming legal title to the Mohegan lands in the Colony of Connecticut. The State asserts that this judgment should be given res judicata effect and bar the Tribe's present action seeking possession of this land.

The plaintiff contends that this defense cannot defeat its claim because (1) it is not res judicata because the Nonintercourse Act was not in existence in 1743 and, therefore, this action presents entirely different issues than the earlier one; and (2) that even if the earlier judgment were given res judicata effect it would not defeat the plaintiff's claim because the 1743 judgment itself recognizes the Indians' possessory right to the lands at issue in this action.

Because I agree with both of the plaintiff's arguments I hold that this defense is clearly insufficient as a matter of law and grant the motion to strike the defendant's fourth additional defense.

An examination of the 1743 judgment clearly demonstrates that the judgment recognized the Indians' possessory rights to between 4,000 and 5,000 acres of land despite the decree affirming title in the Colony of Connecticut. The defendant concedes in its answer to question number seven of Plaintiff's Fifth Set of Interrogatories (filed with the clerk of this court on Octo-

ber 21, 1980) that the land referred to in paragraph 16 and the paragraph following paragraph 17 of the 1743 judgment is the same land claimed by the Tribe in this action. This section of the 1743 judgment reads:

16. That the governor and company having effectually, and for ever, secured a tract of between 4 and 5000 acres of land, situate on the Moheagan river, . . . for the use of the Moheagan Indians; . . .

Lastly, That the said judgment . . . in every part thereof (*except so far as relates to the said tract of between 4 and 5000 acres of land, secured to, and settled on, the Moheagan Indians by the said act of the 11th of May 1721*) ought to be reversed, and declared null and void.

*Mohegan Tribe v. Plantation and Colony of Connecticut,* Appendix I to Defendant's Memorandum of Law in Support of Defendant's Motion to Amend Answer By Adding Additional Defenses (emphasis in original). This judgment thus reversed an earlier decree in favor of the Indians but exempted the land at issue in this suit. It clearly recognizes at least a possessory interest of the Indians in the 4,000 to 5,000 acres which the defendant admits are at issue in this litigation.

The defendant argues nonetheless that this 1743 judgment confirms legal title in the Colony of Connecticut and, therefore, prevents the Tribe's present claim for possession under the Nonintercourse Act. The defendant's position betrays, however, some confusion regarding the nature of Indian title and the relationship between legal title and equitable Indian title.

The law controlling title to Indian lands is complex and obscure to the uninitiated. A distinction is drawn between legal or fee title and the Indians' possessory rights:

It very early became accepted doctrine in this Court that although fee title to the lands occupied by Indians when the colonists arrived became vested in the sover-

eign—first the discovering European nation and later the original States and the United States—a right of occupancy in the Indian tribes was nevertheless recognized. That right, sometimes called Indian title and good against all but the sovereign, could be terminated only by sovereign act. Once the United States was organized and the Constitution adopted, these tribal rights to Indian lands became the exclusive province of the federal law. Indian title, recognized to be only a right of occupancy, was extinguishable only by the United States. *Oneida Indian Nation v. County of Oneida*, 414 U.S. at 667, 94 S.Ct. at 777. The adoption of the federal Constitution ceded to the federal government the power of the original states to terminate the Indians' possessory rights. *See Mohegan Tribe v. State of Connecticut*, 638 F.2d at 616. The fact that Connecticut allegedly has legal title to the aboriginal territory of the Mohegan Indians by virtue of this 1743 judgment has no effect whatever on the Tribe's claim that its possessory interest in the land was alienated in violation of the Nonintercourse Act. Whether or not Connecticut held the fee to the land in question, it could not alienate Indian land without the consent of the federal government after the passage of the first Nonintercourse Act in 1790. Thus, even if I accept for the sake of argument the defendant's position that the 1743 judgment should be given res judicata effect,[2] this judgment cannot defeat the plaintiff's claim that its land was illegally alienated without federal consent after the passage of the Nonintercourse Act. This defense, therefore, "could not possibly prevent recovery" by the plaintiff, *Narragansett Tribe v. So. R.I. Land Devel. Corp.*, 418

F.Supp. at 802, and is stricken from the pleadings as legally insufficient.

## V. *Conclusion*

For the reasons stated above I grant Plaintiff's Motion to Strike the Defendant's Four Additional Defenses.

SO ORDERED.

---

2. If it were necessary to reach the issue I would hold that the 1743 judgment should not be given res judicata effect in this action. The doctrine of res judicata bars relitigation of the same cause of action between the same parties or their successors in interest. *Restatement of Judgments* § 48 (1942). Whether a claim presents the same cause of action is determined by an examination of the "operative facts" of the claim. *Kaufman v. Somers Board of Education*, 368 F.Supp. 28, 32 (D.Conn. 1973). " '[I]f the evidence needed to sustain

the second action would have sustained the first action,' ... then the first claim is res judicata re the second claim." *Id.* (citation omitted).

The primary issue in this case is whether the land claimed by the plaintiff was alienated in violation of the Nonintercourse Act. Since that statute was not passed until over 40 years after the 1743 judgment, this question was clearly not at issue in the earlier case and cannot be resolved by pleading the 1743 judgment as res judicata.